**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

|  |  |  |
|---|---|---|
| CITY OF FLORENCE, SOUTH CAROLINA, | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| 3M COMPANY, | ) ) | |
| *Defendant*. | ) ) ) | **COMPLAINT** (JURY TRIAL DEMANDED) |
| | ) ) ) ) | |

Plaintiff, CITY OF FLORENCE, SOUTH CAROLINA, by and through the undersigned counsel, brings this action against the above-named Defendant for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

## STATEMENT OF THE CASE

1.      Plaintiff, City of Florence, South Carolina, brings this action to address Defendant's ongoing contamination of the Great Pee Dee River and Plaintiff's property with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanesulfonic acid ("PFOS"); perfluorooctanoic acid ("PFOA"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); and perfluorohexane sulfonate ("PFHxS").

2.      Defendant 3M Company ("3M") has in the past and continues to sell and otherwise supply products that contain or degrade to one or more of these PFAS to entities that have

discharged and continue to discharge wastewater contaminated with 3M's PFAS-containing products to the Great Pee Dee River. This contaminated effluent travels downstream to Plaintiff's water intake on the Great Pee Dee River, thereby contaminating Plaintiff's property and the domestic water supply for over 34,000 water customers in Florence County. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendant's ongoing PFAS contamination.

3.      Plaintiff provides potable water to residents of Florence County. It owns and occupies property located in Florence County, where it operates the Pee Dee Regional Water Treatment Plant (a surface water treatment plant, or "SWTP") and related buildings, improvements, property, and equipment that make up its water treatment and distribution system. Plaintiff operates a water intake on the Great Pee Dee River, from which it draws raw water for treatment at the SWTP before distribution to its customers.

4.      Defendant 3M pioneered PFAS chemistry. Since the mid-twentieth century, 3M has manufactured and supplied products based on PFAS chemistry and that contain or degrade to PFOS, PFOA, PFBS, PFHxS, and/or PFNA. 3M has and continues to sell the products to various entities for use in their industrial processes at locations upstream from Plaintiff's water intake, which in turn have and continue to discharge wastewater contaminated with 3M's PFAS-containing products to the Great Pee Dee River upstream from Plaintiff, either directly or indirectly via public wastewater treatment plants ("WWTPs").

5.      Industrial wastewater from 3M's customers' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Great Pee Dee River or tributaries thereof, and flow downstream to Plaintiff's intake. 3M has known for decades—long before Plaintiff, 3M's regulators, and the general

2

public—that the PFAS contained in its products are extremely persistent in the environment, bioaccumulative, and toxic to humans and animals. Further, 3M has long known that its customers' use and disposal of 3M's PFAS-containing products constitute a major source of PFAS contamination of surface waters and public drinking water supplies, like Plaintiff's. Despite this knowledge, 3M has continued to sell PFAS-containing products without providing adequate instructions or other safeguards to prevent the release of 3M's products into the environment. As a direct and proximate result of Defendant's actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.      Defendant 3M's PFAS contaminate Plaintiff's water source at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, 3M's PFAS.

7.      As a result of Defendant's intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendant to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTP that will remove Defendant's PFAS from drinking water. In addition, based on Defendant's intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by Defendant or any third-party.

9.     Plaintiff's causes of action against Defendant 3M arise under South Carolina law.

10.     Plaintiff brings no cause of action and seeks no relief under federal law or statute.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

12.     This Court has personal jurisdiction over Defendant 3M, consistent with due process and South Carolina's long-arm statute, S.C. CODE ANN. § 36-2-803.

13.     Venue is properly within this Court pursuant to 28 U.S.C. § 1391(b) because Defendant has conducted substantial business in this District, a substantial portion of the acts and omissions giving rise to this action occurred in this District, and the subject of the action is for injuries sustained to Plaintiff's property located in this District.

## PARTIES

14.     **Plaintiff City of Florence, South Carolina** is a municipal corporation organized and existing under the laws of South Carolina. *See* S.C. CODE ANN. §§ 5-7-10 *et seq.*; 5-31-610. Through its Department of Public Works, Plaintiff provides potable water services to its customers.

15.     Plaintiff owns land located at 2598 Florence Harllee Boulevard, Florence, South Carolina 29506, on which it operates its SWTP and related buildings, improvements, property and

4

equipment that make up its water treatment and distribution system. Plaintiff also owns land riparian to the Great Pee Dee River, on which it operates a water intake to draw raw water for treatment and provision to its customers.

16.     Plaintiff's SWTP provides potable water over 34,000 customers in Florence County.

17.     **Defendant 3M Company ("3M")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, 3M has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS to facilities that discharge the products, directly or indirectly, to the Great Pee Dee River upstream from Plaintiff.

## FACTUAL ALLEGATIONS

I.     **Background and Hazards of PFAS**

18.     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

19.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

20.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, and PFBS. Polymer PFAS include fluoropolymers

and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold by 3M.

21.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, and PFBS are all terminal PFAS.

22.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

23.     Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization. 3M is the only U.S. company known to have used ECF to manufacture PFAS. Uniquely, PFOS, PFHxS, and PFBS can only be produced via ECF, and therefore, these compounds are entirely attributable to 3M.

24.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

25.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of

PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, and PFBS. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

26.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues in the United States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

27.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS.

28.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[1] The advisory levels at that time were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding

---

[1] U.S. EPA, *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)* (Jan. 8, 2009), *available at* https://www.epa.gov/ sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

29.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

30.     EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

---

[2] *Id.*

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

[4] *Id.*

[5] *Id.*

31.     On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

32.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and hexafluoropropylene oxide dimer acid ("HFPO-DA," also known as "GenX Chemicals"). For PFBS, EPA emphasized studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

33.     In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[8] An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered

---

[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[7] *Id.*

[8] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

34.    At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[9] Therefore, it proposed MCLG levels for both chemicals at zero ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[10]

35.    Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[11] If greater than 1.0, then "potential risk is indicated."[12]

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

36.    EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[13]

37.    EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[14] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[15]

38.    The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts."[16] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[17]

39.    EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking

---

[13] U.S EPA, *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[14] U.S. EPA, *PFAS Nat'l Primary Drinking Water Regulation Rulemaking* (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

[15] U.S. EPA, *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S. EPA, *Final PFAS Nat'l Drinking Water Regulation Landing Page*, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

[16] U.S. EPA, *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024).

[17] U.S. EPA, *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

40.     EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

41.     On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[18] Although EPA announced its intention to rescind the MCLs concerning PFNA, PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act.," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS is linked to significant health risks.[19] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[20]

42.     EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[21] Under the April 10, 2024 final National Primary

---

[18] U.S. EPA, *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), *available at* https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter *EPA 2025 MCL Announcement*].

[19] *Id.*

[20] *Id.*

[21] *Id.*

Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

## II.     Contamination of the Great Pee Dee River with PFAS

43.     Plaintiff's surface water intake rests on the Great Pee Dee River in Florence County, South Carolina, which draws water from the river for treatment at Plaintiff's SWTP before distribution to customers.

44.     PFAS sampling of the Great Pee Dee River upstream of Plaintiff's water intake confirms the presence of PFOA, PFOS, PFHxS, PFNA, and PFBS throughout the river system. These PFAS flow downstream and contaminate the water at Plaintiff's water intake at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intake confirms the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. 3M is a primary contributor to this contamination, as it manufactured and sold at least all of the PFOS, PFHxS, and PFBS.

45.     3M sold and otherwise supplied products containing PFOA, PFOS, PFHxS, PFNA, and/or PFBS to facilities that discharge to surface waters upstream from Plaintiff. 3M's customers use, or used, 3M's PFAS-containing products in their industrial processes. Those industrial processes generate wastewater containing 3M's PFAS, and 3M's customers disposed of the PFAS-contaminated wastewater by discharging it directly, or indirectly via public WWTPs, to surface waters. Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, 3M did not require, instruct, advise, or otherwise direct its customers to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property.

13

46.     3M's PFAS and their precursors flow downstream from the facilities where the chemicals are released to surface waters to Plaintiff's water intake, damaging Plaintiff's property and contaminating its water source.

47.     Plaintiff's SWTP utilizes conventional water treatment technologies to treat raw water, none of which remove PFAS. Instead, Plaintiff's SWTP requires new water treatment technologies to do so.

48.     3M knew or should have known that conventional treatment technologies used by its customers and the WWTPs that treat its customers' wastewater cannot remove PFAS from wastewater. 3M further knew or should have known that its customers' inadequately treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

49.     3M also knew or should have known that conventional treatment technologies used by public water systems like Plaintiff's cannot remove PFAS from water that is treated and distributed as potable drinking water.

**III.     Defendant 3M Had Superior Knowledge of PFAS's Hazardous Properties.**

50.     3M pioneered the field of PFAS chemistry in the middle of the twentieth century, and it has since been the leader in the industry. 3M's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, the public, and most competitors.

51.     3M has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. 3M was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

52.     3M has long known that PFOA, PFOS, PFHxS, PFNA, and PFBS are environmentally persistent, bioaccumulative, dose-additive, and toxic; that they cannot be removed by conventional water treatment methods; and that there is no safe dose for PFOA and PFOS.

53.     3M has known for at least 40 years that PFAS chemicals persist in the environment and accumulate in the bodies of humans, fish, and animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15–20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant in Decatur, Alabama) showed that these chemicals bioaccumulate in fish.

54.     3M has also known for at least 40 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the fluorochemicals. Twenty-one years later, 3M told the public that a "new study" on these compounds' effects on Rhesus monkeys was one reason 3M pulled its fluorochemical products based on long-chain PFAS, like PFOS and PFOA, off the market, starting in 2000.

55.     In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

56.     3M has known for at least 30 years that disposal of PFOA and PFOS through discharge into waterways was improper. For instance, a Materials Safety Data Sheet ("MSDS") produced by 3M in 1986 warned that PFOA should be disposed of only through incineration or at

specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped onto the ground.

57.     3M has known for at least 40 years that PFOA, PFOS, and related chemicals are not effectively treated by conventional wastewater treatment plant processes, are discharged to surface waters via the effluent, and accumulate in the sludge from wastewater treatment processes. For example, in 1978, 3M found that the bacteria in wastewater treatment plants would not biodegrade PFOA.

58.     A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other PFAS and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

59.     Beginning in the 1990s, 3M conducted a comprehensive evaluation of potential sources and routes of exposure to its products based on long-chain PFAS like PFOS and PFOA.

60.     3M's research in the 1990s confirmed what it had already known since the late 1970s: 3M's PFAS, in particular, PFOS, bioaccumulated in human blood. Moreover, 3M confirmed that its PFAS were not only in the blood of its exposed workers but also widespread in the blood of the general population.

61.     In light of its knowledge about the pervasive ongoing human exposure to its PFAS, by the late 1990s, 3M recognized that its continued extreme secrecy regarding this knowledge was becoming untenable.

62.     In May 2000, 3M announced that it would be phasing out its manufacture and sale of products based on long-chain PFAS by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood

16

of the general public. However, 3M claimed, and continues to claim—contrary to its own internal research, that no adverse human health effects were linked to PFAS exposure.

63.    Around the same time it phased out long-chain PFAS-based products, 3M rushed into replacement products based on short-chain PFAS chemistry that contained and/or degraded to PFBS. Although 3M has and continues to contend that PFBS-based products are "safer" than its former products based on primarily PFOS and PFOA, 3M knew that PFBS was still persistent, bioaccumulative, and toxic, and presented similar risks to drinking water supplies.

64.    In fact, around the time that 3M was preparing to phase out its manufacture and sale of long-chain PFAS, it briefly considered shifting away from PFAS chemistry entirely in favor of nonfluorinated alternative products that did not pose the same health and environmental risks as the PFAS products. Instead, 3M continued to concentrate on PFAS-based products for years to come.

65.    Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of 3M's own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if 3M had not chosen to ignore the clear evidence of health and environmental dangers it possessed decades ago.

66.    Confronted with souring consumer sentiment and mounting liabilities related to PFAS, 3M announced in December 2022 that "it will exit per- and polyfluoroalkyl substance (PFAS) manufacturing and work to discontinue the use of PFAS across its product portfolio by the end of 2025."[22] More than two years after this announcement, however, it is dubious whether

---

[22] Press Release, 3M, *3M to Exit PFAS Manufacturing by the End of 2025* (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.

3M will achieve these goals and, moreover, whether 3M will actually cease *supplying* PFAS-containing products.

67.     Despite 3M's knowledge that its products contained or degraded to PFOA, PFOS, PFHxS, PFNA, and/or PFBS; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove its PFAS from wastewater; and that its customers discharged these PFAS to the Great Pee Dee River, damaging and interfering with Plaintiff's property rights and public health, 3M continued to sell products containing or degrading to these PFAS under brand names including Scotchgard.

**IV.     Defendant 3M's Direct Involvement in Its Customers' PFAS Use and Disposal.**

68.     At all times relevant hereto, 3M was directly involved in, and exercised control over, its customers' use, handling, application, and disposal of 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS.

69.     3M specified the type and amount of its PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at its customers' facilities upstream from Plaintiff's intake on the Great Pee Dee River.

70.     3M designed and provided equipment for the use of 3M's PFAS-containing products at customer facilities upstream from Plaintiff's intake on the Great Pee Dee River.

71.     3M jointly conducted research with its customers for new PFAS-containing products as well as methods of using or applying these products.

72.     3M monitored the products manufactured by its customers for the amount of 3M's PFAS-containing products used in the manufacture of the customers' products in order to ensure those products met 3M's specifications on the amount of PFAS-containing products to be used or applied.

73.     3M was in constant contact with its customers concerning the use, handling, application, and disposal of 3M's PFAS-containing products.

74.     Employees of 3M were routinely present in customer facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of 3M's PFAS-containing products.

75.     3M provided information to its customers concerning the health and environmental impacts of 3M's PFAS-containing products, and 3M's customers, at least in part, relied on this information.

76.     3M was familiar with the wastewater disposal practices of its customers' facilities, including that a portion of 3M's PFAS-containing products went into the customers' wastewater streams and that its customers' wastewater treatment methods and/or the methods used by its customers' receiving WWTPs could not remove 3M's PFAS from the effluent. 3M nevertheless failed to require, instruct, advise, or otherwise direct its customers to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. 3M continued to sell its PFAS-containing products to customers it knew or should have known were disposing of the products in an environmentally irresponsible manner.

77.     3M has been aware for many years of the presence of their PFAS chemicals in the Great Pee Dee River upstream of Plaintiff's intake.

**V.     Defendant 3M Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Its PFAS Products.**

78.     3M actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of its PFAS-containing products, distorting public discourse on and

downplaying the harmful effects of PFAS, misleading EPA on the safety of its PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to 3M's position.

79.     3M and other PFAS manufacturers, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote products they knew to be dangerous to the environment and human health. 3M engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, and/or PFBS, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

80.     The delay in PFAS regulation resulted directly from 3M's and other PFAS manufacturers' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

## VI.     Defendant 3M Has Harmed Plaintiff and Plaintiff's Community.

81.     For decades and unknown to Plaintiff, 3M has supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS and their precursors to customer facilities located upstream from Plaintiff, while knowing that those facilities discharge wastewater laden with these PFAS directly and/or indirectly to surface waters upstream of Plaintiff's water intake. As a result, 3M has caused contamination of the Great Pee Dee River with PFAS exceeding EPA's health advisories, MCLGs, and MCLs. Indeed, absent new water treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

82.    3M's conduct has proximately caused the contamination of the Great Pee Dee River and of Plaintiff's land, its SWTP, and its water treatment and distribution system with PFOA, PFOS, PFHxS, PFBS, and PFNA—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

83.    3M knowingly, intentionally, recklessly, and/or negligently engaged in acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the Great Pee Dee River, and 3M has caused Plaintiff additional past, present, and future injury to property.

84.    Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, and PFBS are hazardous to human health, 3M continued to supply these chemicals to its customers, knowing that they discharged these chemicals into the Great Pee Dee River or tributaries thereof, which 3M knew or should have known contaminated Plaintiff's property.

## FIRST CAUSE OF ACTION

### Private Nuisance

85.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

86.    Plaintiff is a municipal corporation that operates a surface water treatment plant and water treatment and distribution system for the purpose of producing and supplying safe potable drinking water for residents of Florence County. It uses its properties for those purposes, including the withdrawal of raw water from the Great Pee Dee River, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers.

87.    Plaintiff owns riparian land abutting the Great Pee Dee River, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers.

88.     Through the conduct described herein, Defendant 3M created, contributed to, and/or maintained a nuisance; that is, the contamination of the Great Pee Dee River, with PFOA, PFOS, PFHxS, PFNA, PFBS, and their precursors at concentrations exceeding those EPA deems unsafe for consumption.

89.     Due to Defendant 3M's contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

90.     Defendant 3M's contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

91.     Defendant 3M has knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

92.     As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to 3M's contamination of the Great Pee Dee River and Plaintiff's property, including loss in value, the cost of removing 3M's PFAS, and other damages to be proved at trial.

93.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendant 3M.

94.     The ongoing contamination of the Great Pee Dee River and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendant to fund the measures

necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of the Great Pee Dee River to supply potable water to its customers.

95.     Defendant 3M's interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, and/or PFBS contamination.

96.     Defendant 3M is liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

97.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

98.     Plaintiff is a municipal corporation that operates a surface water treatment plant and water treatment and distribution system for the purpose of producing and supplying safe potable drinking water for residents of Florence County. It uses its properties for those purposes, including the withdrawal of raw water from the Great Pee Dee River, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers.

99.     Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

100.     Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendant 3M's PFOA, PFOS, PFNA, PFHxS, and PFBS. Defendant 3M's contamination

unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

101.    Plaintiff has sustained special injuries as a result of Defendant 3M's public nuisance, including but not limited to the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, and/or PFBS deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of 3M's contamination; interference with Plaintiff's right to use the Great Pee Dee River; interference with the use of Plaintiff's SWTP and water treatment and distribution system; and lost revenue.

102.    As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to 3M's contamination of the Great Pee Dee River and Plaintiff's properties.

103.    Defendant 3M has knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

104.    As a result of the nuisance caused by Defendant 3M, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing 3M's PFAS, and other damages to be proved at trial.

105.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendant 3M.

106.    Defendant 3M's ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy

at law. Plaintiff requests that this Court issue an order and decree requiring Defendant to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

107.    Defendant 3M's contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, and PFBS can be abated by requiring Defendant to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, and/or PFBS contamination.

108.    Defendant 3M is liable to Plaintiff for all damages resulting from this nuisance, and the costs of abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

**THIRD CAUSE OF ACTION**

**Trespass**

109.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

110.    Plaintiff owns, possesses, and actively exercises its right to use its land, SWTP, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

111.    Defendant 3M intentionally supplied and continued to supply PFAS-containing products notwithstanding that 3M knew and/or reasonably should have known that:

(a)    its customers' facilities discharged and continue to discharge, directly or indirectly, 3M's PFAS-containing products to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove 3M's PFAS-containing products from wastewater before discharge to the Great Pee Dee River;

      (b)     Plaintiff draws water from the Great Pee Dee River for the provision of drinking water to its customers;

      (c)     water Plaintiff draws from the Great Pee Dee River is contaminated with 3M's PFAS-containing products, which 3M's customers directly or indirectly discharged to upstream surface waters; and, thereby

      (d)     water contaminated with high concentrations of 3M's PFAS-containing products and/or PFAS invades Plaintiff's properties.

112.    Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, and/or PFBS at concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

113.    Defendant 3M's invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

114.    Defendant 3M intends that its customers, while using 3M's PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with 3M's PFAS-containing products by discharging it, directly or indirectly, to surface waters. Defendant's conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

115.    Defendant 3M's conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems. The damage to Plaintiff's properties is the direct and proximate result of Defendant's intentional conduct.

116.    As a direct, proximate, and foreseeable result of Defendant 3M's trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendant's PFAS, and other damages to be proved at trial.

117.    Defendant 3M's ongoing trespasses can be abated by requiring Defendant to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTP to remove PFOA, PFOS, PFHxS, PFNA, and/or PFBS contamination.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

118.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

119.    Defendant 3M has a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, and/or PFBS to ensure the proper use and disposal of these products and prevent their improper use and disposal.

120.    Defendant 3M had superior knowledge that the PFOA, PFOS, PFHxS, PFNA, and/or PFBS contained in or degrading from its products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Great Pee Dee River, were vulnerable to the contamination that now takes place.

121.    By continually supplying its PFAS-containing products without providing its customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of its PFAS to surface waters, Defendant 3M breached its duty of care and negligently, recklessly, wantonly, and willfully created the risk that its PFAS would contaminate the Great Pee Dee River, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

122.    As a direct, proximate, and foreseeable result of Defendant 3M's conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing 3M's PFOA, PFOS, PFHxS, PFNA, and/or PFBS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing 3M's PFAS; and other damages to be proved at trial.

123.    Defendant 3M is liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn

124.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

125.    Defendant 3M designs, manufactures, formulates, promotes, markets, and/or distributes products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS.

126.    Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS are used by 3M's customers in a reasonably foreseeable manner and without

substantial change in the condition of such products, and 3M knew that its customers purchase and use its products without inspection for defects.

127.    Defendant 3M knew that the use of its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS purchased or otherwise acquired from 3M would result in its products being discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

128.    Defendant 3M knew that its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS were environmentally persistent and bioaccumulative, that not all of its products are exhausted or adhere in its customers' applications, that a portion of its products enter wastewater and thus are discharged via its customers' sewer pipes, and that wastewater treatment facilities utilize conventional wastewater treatment methods that cannot remove 3M's products from wastewater before it is discharged to surface waters that Plaintiff relies on to supply potable water to the public, making 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS unreasonably dangerous.

129.    Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Defendant 3M has failed to provide adequate warnings to its customers and other users or to take any other precautionary measure to mitigate these hazards.

130.    Defendant 3M has failed to adequately describe such dangers or provide precautionary statements regarding such hazards, and 3M has failed to provide instruction or direction on the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS in the labeling of its products.

131.    As a direct and proximate result of Defendant 3M's failure to warn of the dangers and hazards posed by discharging their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS, such PFAS have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

132.    As a direct, proximate, and foreseeable result of Defendant 3M's conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing 3M's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing 3M's PFAS; and other damages to be proved at trial.

133.    Defendant 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. 3M's conduct was performed to promote sales of its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS in conscious disregard of the probable dangerous consequences of its conduct and the reasonably foreseeable impacts on public health and property.

## SIXTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity

134.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

135.    PFOA, PFOS, PFHxS, PFNA, and PFBS are unreasonably dangerous to humans and the environment.

136.    Defendant 3M manufactured, formulated, handled, sold, and/or distributed products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS to customer facilities upstream from Plaintiff, knowing that these PFAS have been, and are presently,

discharged to surface waters, and thereby enter and contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

137.    Rather than require the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS, Defendant 3M required or permitted its customers to discharge these products, which it knew to be hazardous, to surface waters upstream from Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

138.    Defendant 3M knew that PFOA, PFOS, PFHxS, PFNA, and/or PFBS were environmentally persistent, bioaccumulative, dose-additive, and toxic; and Defendant knew there was no safe dose of PFOA or PFOS.

139.    Defendant 3M knew or expected that these hazardous PFAS that it was manufacturing, formulating, handling, selling, and/or distributing would reach Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left the hands of 3M.

140.    Defendant 3M manufactured, formulated, handled, sold, and/or distributed its products that were dangerous and unsafe for the uses and purposes for which they were intended despite knowing the consequences of their use and of exposure to its products.

141.    Defendant 3M or its agents were responsible for the unreasonably dangerous products sold and distributed to 3M's customers and received financial benefits from their sale and distribution.

142.    As a direct, proximate, and foreseeable result of Defendant 3M's ultrahazardous activities, its PFOA, PFOS, PFHxS, PFNA, and/or PFBS have damaged Plaintiff's SWTP and

related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

143.    As a direct, proximate, and foreseeable result of Defendant 3M's ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing 3M's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing 3M's PFAS; and other damages to be proved at trial.

144.    Defendant 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. 3M's conduct was performed to promote sales of its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS in conscious disregard of the probable dangerous consequences of its conduct and the reasonably foreseeable impacts on public health and property.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect

145.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

146.    PFOA, PFOS, PFHxS, PFNA, and PFBS are unreasonably dangerous to humans and the environment.

147.    Defendant 3M knew that its customers would purchase and use its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS without inspection for defects.

148.    Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS have been, and are presently, discharged to surface waters, and thereby enter and

contaminate the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

149.    Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS were used in a reasonably foreseeable manner and without substantial change in their condition.

150.    Defendant 3M knew that the use of its products containing or degrading to these PFAS in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, and/or PFBS contaminating the source of water from which Plaintiff draws water and Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

151.    Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS sold and/or distributed to customer facilities upstream from Plaintiff were and are defective in design and unreasonably dangerous for their intended use because:

(a)    PFAS resist environmental degradation;

(b)    PFAS cause extensive and persistent surface water contamination when used and discharged to surface waters in their foreseeable and intended manner;

(c)    PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(d)    Defendant failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(e)     There are and were safe or safer alternatives to PFAS that Defendant could have employed in its products.

152.    Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS were and are dangerous to a degree beyond that which was and is contemplated by the ordinary consumer.

153.    The foreseeable risk of harm to public health and property posed by Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS outweighed and outweigh the utility of such products and the cost to 3M of reducing or eliminating those risks.

154.    A reasonable product manufacturer would have known of the significant dangers posed by Defendant 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS.

155.    As a direct, proximate, and foreseeable result of the use of Defendant 3M's defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS, these PFAS have damaged Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

156.    As a direct, proximate, and foreseeable result of the use of Defendant 3M's defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing 3M's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing 3M's PFAS; and other damages to be proved at trial.

157.   Defendant 3M committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. 3M's conduct was performed to promote sales of its products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS in conscious disregard of the probable dangerous consequences of its conduct and the reasonably foreseeable impacts on public health and property.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranties

158.   Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

159.   Defendant 3M manufactures, sells, and distributes products to be used in its customers' ordinary industrial applications with knowledge of the purposes for which its customers use its products.

160.   Defendant 3M's products include those that contain or degrade to PFOA, PFOS, PFHxS, PFNA, and/or PFBS, and Defendant knows or has reason to know that such products are not fit for the known and ordinary uses at 3M's customers' facilities.

161.   Defendant 3M knows that its customers directly and/or indirectly discharge 3M's products containing or degrading to PFOA, PFOS, PFHxS, PFNA, and/or PFBS to surface waters, including the Great Pee Dee River and/or tributaries thereof.

162.   Defendant 3M knows that PFOA, PFOS, PFHxS, PFNA, and/or PFBS are environmentally persistent, bioaccumulative, dose-additive, and toxic, and Defendant knows there is no safe dose of PFOA or PFOS.

163.   Defendant 3M has breached applicable implied warranties, and as a result, Plaintiff's SWTP and related buildings, improvements, property, and equipment that make up its water treatment and distribution system are contaminated with Defendant's PFOA, PFOS, PFHxS,

PFNA, and/or PFBS, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

164.     As a direct, proximate, and foreseeable result of Defendant 3M's activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing 3M's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing 3M's PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Defendant's breaches of implied warranties.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief where available:

(a)     Enter a judgment and decree against Defendant requiring it to abate the nuisance it has caused, created, and maintained;

(b)     Enter a judgment and decree against Defendant requiring it to abate its trespasses onto Plaintiff's properties;

(c)     Enter a judgment and decree against Defendant requiring it to remove its PFOA, PFOS, PFHxS, PFNA, and PFBS from Plaintiff's water system by funding the evaluation, testing, acquisition, installation, operation, and maintenance of treatment technology capable of removing them;

(d)     Enter a judgment against Defendant for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as

applicable, in an amount sufficient to punish and penalize Defendant, and to deter it from repeating its wrongful conduct, and all costs; and

(e)    Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (Fed. Bar No. 4619)
Marghretta H. Shisko (Fed. Bar No. 11601)
Christopher R. Jones (Fed. Bar No. 13204)
Griffin L. Lynch (Fed. Bar No. 9580)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

May 29, 2025